· 2004 UT 86

**MOUNTAIN RANCH ESTATES, Petitioner,**

v.

**UTAH STATE TAX COMMISSION, Respondent.**

No. 20030423.

Supreme Court of Utah.

Oct. 26, 2004.

Joseph E. Tesch, Kraig J. Powell, Victoria W. Romney, Park City, for Mountain Ranch Estates.

Jami R. Brackin, David L. Thomas, Coalville, for The Board of Equalization of Summit County.

Mark L. Shurtleff, Att'y Gen., Laron J. Lind, Asst. Att'y Gen., Salt Lake City, for Utah State Tax Commission.

NEHRING, Justice:

¶ 1 Mountain Ranch Estates seeks review of the Utah State Tax Commission's final decision denying it an adjustment in its 2001 tax valuation. Mountain Ranch claims that the Commission erred when it refused to grant Mountain Ranch tax relief under Utah Code section 59-2-1006(4), which mandates a reduction in the assessed value of a property if the subject property's appraisal deviates five percent from the assessed value of comparable properties. We affirm.

## FACTUAL AND PROCEDURAL HISTORY

¶ 2 Mr. Andrew Shaw purchased two hundred acres of land in the Snyderville Basin area of Summit County, Utah. Mr. Shaw applied for, and received, development approval for an eighty-one lot, single-family residential subdivision called Mountain Ranch Estates. By October 2000, much of the infrastructure work was complete, and lots were marketed and sold. By the end of 2000, Mountain Ranch had sold twelve totaling a little over $2 million.

¶ 3 The Summit County Assessor's Office assessed the value of the Mountain Ranch property for the purpose of determining property tax. The assessor assigned value to Mountain Ranch based on the sale prices of ten of the twelve lots sold. By using this data of actual lot sales, the assessor valued Mountain Ranch's unsold lots at ninety-five to one hundred percent of their list prices.

¶ 4 At approximately the same time Mountain Ranch was under development, a second Snyderville Basin subdivision, Glenwild Phase I, was underway. Glenwild and Mountain Ranch shared certain characteristics. Both employed some of the same contractors, and both were available for sale at approximately the same time. Mountain Ranch and Glenwild Phase I share similar mountain settings and views, and both are marketed to affluent purchasers seeking second homes. Unlike Mountain Ranch, however, Glenwild was approved as a three-phase development. Glenwild also has amenities not planned for Mountain Ranch such as gated access, a private golf course, tennis courts, and a clubhouse. By the end of 2000, while Mountain Ranch had sold twelve lots to Glenwild's seven, Glenwild's sales had produced $1 million more than Mountain Ranch's total sales.

¶ 5 The Summit County assessor valued each Glenwild lot by dividing the purchase price for the raw land comprising the subdivision by the total number of approved lots. The application of this formula resulted in an assessed value of Glenwild lots which was substantially less than the asking price for the lots. The ratio between the assessed value and asking price therefore greatly exceeded the ratio reached in the assessment of Mountain Ranch.

¶ 6 After failing to persuade the Summit County Board of Equalization to adjust its assessed valuation to match that of Glenwild, Mountain Ranch appealed to the Utah State Tax Commission. It challenged both the statutory and the constitutional legitimacy of its assessed valuation. Mountain Ranch contended that it was entitled to relief under Utah Code section 59–2–1006(4), which applies to property valued outside the range of five percent of the valuation assigned to comparable properties. It also claimed that it was denied equal protection in violation of the United States and Utah Constitutions. After a hearing, the Commission entered its findings of fact, conclusions of law, and final decision affirming the Board of Equalization. Mountain Ranch then sought review in this court, renewing its statutory and constitutional challenges. We affirm.

## STANDARD OF REVIEW

¶ 7 The Commission's determination that Mountain Ranch was not entitled to an adjustment to its assessment under section 59–2–1006(4) requires us to apply several standards of review. Utah Code Ann. § 59–2–1006(4) (2000). We will affirm the Commission's factual findings, which here center on the similarities and differences between Mountain Ranch and Glenwild, if they are supported by substantial evidence. Utah Code Ann. § 59–1–610(1)(a) (2000). We have no occasion, however, to conduct such a review of the Commission's factual findings because we affirm the Commission's ruling on legal grounds independent of Mountain Ranch's factual challenges. We review the

Commission's interpretation of section 59–2–1006(4) for correctness. *Id.* The interpretative dispute generated in this review concerns the meaning of "comparable properties." *Id.* § 59–2–1006(4). Finally, we also apply a nondeferential standard of review to the Commission's rulings on Mountain Ranch's constitutional claims. *Id.* § 59–1–610(1)(b).

## ANALYSIS

¶ 8 Mountain Ranch insists that it was erroneously denied relief mandated by section 59–2–1006(4) of the Utah Code. Utah Code Ann. § 59–2–1006(4) (2000). This statute requires the county board of equalization to "adjust property valuations to reflect a value equalized with the assessed value of other comparable properties if: . . . (b) the commission determines that the property that is the subject of the appeal deviates in value plus or minus 5% from the assessed value of comparable properties." *Id.* Mountain Ranch contends that, contrary to the Commission's findings of fact, it successfully demonstrated that Glenwild was a "comparable property" to Mountain Ranch and, because Mountain Ranch was valued at five percent more than Glenwild, it is entitled to an adjustment of its valuation to match Glenwild's. The Commission read the terms "comparable properties" as used in section 59–2–1006(4) to require a party seeking an adjustment to present more than one similar but disparately valued property in order to be eligible for a valuation adjustment. *Id.* We agree.

¶ 9 We base our interpretation on the plain language of the statute and the compatibility of that interpretation with the Utah Constitution and Utah Property Tax Act.[1] Under our rules of statutory construction, we look first to the statute's plain language to determine its meaning. *Lovendahl v. Jordan Sch. Dist.*, 2002 UT 130, ¶ 21, 63 P.3d 705. Under a plain language analysis, we interpret "comparable properties" to mean plural or multiple properties—more than one

---

**1.** The Utah Property Tax Act can be found at title 59, chapter 2 of the Utah Code. Utah Code Ann. §§ 59–2–101 to –1372 (2000).

comparable property. As the Commission noted, Mountain Ranch's interpretation of section 59–2–1006(4) would mean that "any property owner could have its assessment lowered if it could find a single under-assessed comparable property even if the other 10, 20 or 30 comparable properties were assessed within 5 percent of the subject property's assessed value."

¶ 10 Mountain Ranch attempts to turn the Commission's reasoning on its head, contending that neither the Commission nor the Board of Equalization identified another suitable comparable property other than Glenwild and, therefore, Glenwild itself acquired the status of multiple properties because it represented "all" comparable properties. We do not read section 59–2–1006(4) to shift to the Commission or county the burden of producing comparable properties within the five-percent valuation range in order to avoid transforming the valuation of a single comparable property, identified by a property owner, into a benchmark of uniformity and equality to which the other property's valuation must be adjusted. *See First Nat'l Bank of Nephi v. Christensen*, 39 Utah 568, 578, 118 P. 778 (1911) (holding that the burden to show inequality of an assessment is on the taxpayer).

■ ¶ 11 Our interpretation is supported not only by the plain language of section 59–2–1006(4), but by the constitutional and statutory provisions from which this valuation adjustment formula derives. "We read the plain language of the statute as a whole, and interpret its provisions in harmony with other statutes in the same chapter and related chapters." *Miller v. Weaver*, 2003 UT 12, ¶ 17, 66 P.3d 592. Article XIII, section 2 of the Utah Constitution states that "[a]ll tangible property in the state . . . shall be taxed at a uniform and equal rate in proportion to its value, to be ascertained as provided by law." Utah Const. art. XIII, § 2, cl. 1.

■ ¶ 12 The Utah Property Tax Act codified this constitutional mandate, providing that "[a]ll tangible taxable property shall be assessed and taxed at a uniform and equal rate on the basis of its fair market value."

Utah Code Ann. § 59–2–103(1) (2000). The hallmarks of these constitutional and statutory directives are the notions of uniformity, equality, and a universal measure of valuation—fair market value. At the core of Mountain Ranch's argument is its contention that section 59–2–1006(4) reflects a legislative intention that considerations of uniform and equal tax assessment be given preeminent policy status over fair market value. Put another way, it reads the statute to stand for a taxation policy that prizes uniformity of valuation over accuracy of valuation, and a taxation policy that countenances erroneous property valuations so long as the error is uniformly applied. To make its case that it was comparable to Glenwild, Mountain Ranch must discredit fair market value as a relevant factor in conducting a section 59–2–1006(4) inquiry because it concedes that the assessment of its property properly reflects its fair market value.

¶ 13 According to Mountain Ranch, actual lot sales, rather than relative stages of completion, is, to use Mountain Ranch's term, the "sine qua non" of fair market value determination. Mountain Ranch was valued using its sales history, and its assessed valuation accurately reflected its fair market value. Although Glenwild had sold lots at or about their asking prices, their value was based on the purchase price of the raw land. If, as Mountain Ranch contends, Glenwild was a property comparable to Mountain Ranch for purposes of section 59–2–1006(4), it could not have been assessed at its fair market value. Mountain Ranch does not argue that an adjustment in its valuation to bring it in line with the assessed valuation of Glenwild would result in an equalization of their assessments based on fair market value. To the contrary, Mountain Ranch contends that section 59–2–1006(4) exists solely to ensure taxation equality and uniformity and has nothing whatsoever to do with fair market value.

¶ 14 Mountain Ranch correctly notes that we have ratified a hierarchy of interests in which the standard of value must yield to equality, but to the extent that section 59–2–1006(4) [2] renders considerations of fair mar-

2. Mountain Ranch attempts to build an argu-    ment distinguishing section 59–2–1004(4)(f)(i)

ket value subservient to the interests of equality and uniformity, it undercuts the claim that the statute may be invoked to provide relief where a valuation disparity exists between only two allegedly comparable properties. *See Kennecott Copper Corp. v. Salt Lake County,* 799 P.2d 1156, 1161 (Utah 1990) (holding that "[w]here it is impossible to achieve perfectly both the standard of true value and the standard of uniformity and equality, the latter standard should prevail.").

■ ¶ 15 Fair market value indeed becomes a subordinate consideration in a scenario where a property owner's assessment accurately reflects the property's fair market value, but nevertheless exceeds by more than five percent the valuation of comparable properties. Where an accurate fair market value assessment stands apart from a group of undervalued comparable properties, valuation accuracy may not be used to defend the otherwise aberrant assessment. The property owner "singled out" for a legitimate fair market value assessment would be entitled to relief under section 59–2–1006(4).

¶ 16 Such a scenario would also likely be constitutionally suspect. Intentional and systematic undervaluations of property may violate the equal protection and due process rights of property owners not granted preferential treatment. *See Allegheny Pittsburgh Coal Co. v. County Comm'n,* 488 U.S. 336, 343, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989) (holding that the Equal Protection Clause allows states to divide property into classes and assign a tax burden to the property as long as the divisions and burdens are neither arbitrary nor capricious); *Nelson v. Bd. of Equalization,* 943 P.2d 1354, 1356–57 (Utah 1997) (holding that petitioner's due process rights were not violated by property tax assessment of his property because he was provided "adequate notice and hearing thus satisfying the due process requirements of the state and federal constitutions"). The presence of multiple unfairly advantaged

properties necessarily raises the suspicion of a potential inequality meriting a remedy. It is the nature of this inequality that section 59–2–1006(4) was enacted to address. Its protection may be fairly described as a statutory mechanism to implement the constitutional guarantee of uniform taxation.

¶ 17 It is, of course, impossible to extract evidence of a systematic practice of undervaluation from the valuations of property within a class limited to two comparable properties. Mountain Ranch assumes that, when a disparity in valuation of more than five percent occurs, section 59–2–1006(4) entitles the higher valued property to receive a downward adjustment in order to match the lesser-valued property. This is not a self-evident formula for achieving uniformity and equality. Were equality the sole objective, it could just as well be realized by increasing the valuation of the lower-valued property to the level of the higher one. Mountain Ranch implies, without explanation, that because the concept of fair market value has no place in the equalization scheme set out in section 59–2–1006(4), the primary policy principle guiding the definition of equality should be that the taxpayer should always enjoy the benefit of a valuation disparity and, therefore, all adjustments in valuation must be made to match those of lower valued properties, irrespective of considerations of fair market value.

¶ 18 Without more class members to serve as points of reference, or absent an independent benchmark like fair market value, one may not determine with any degree of confidence which, if either, of the two members has a legitimate claim to disparate and unequal treatment. As the size of the class increases, so does the ability to, in statistical nomenclature, establish a satisfactory "confidence level" in plotting the location of class members in relationship to a norm or mean. Where a two-member class of comparable properties presents a deviation in valuation

from section 59–2–1006(4) on the basis of their respective treatments of fair market value. *See* Utah Code Ann. § 59–2–1004(4)(f)(i) (Supp. 2003); *id.* § 59–2–1006(4). Our analysis, with its focus on the necessity for multiple comparable properties to make either section applicable, makes this distinction irrelevant. Similarly, our

analysis makes unnecessary a discussion of Mountain Ranch's objection to the Commission's reliance on Utah Administrative Code Rule 861–1A–7(G) relating to the burden of proof to establish fair market value. Utah Admin. Code R861–1A–7(G) (2003).

between its members exceeding the five percent tolerance range adopted in section 59–2–1006(4), it is impossible to equalize valuation by adjusting the assessed valuation of one of the member properties. Utah Code Ann. § 59–2–1006(4). Rather, statistical equality could be achieved only by averaging the valuations assigned to each member and adjusting their valuations to conform to that average. Section 59–2–1006(4) neither contemplates nor requires this exercise. *Id.* Instead, it resolves the question by making valuation adjustment relief available only to the aggrieved property owner who can compile evidence of more than one comparable property with valuations outside its five percent tolerance range. *Id.*

¶ 19 Section 59–2–1006(4) cannot compel an adjustment of the property valuation of a disappointed property owner who is unable to point to more than one disparately valued comparable property. *Id.* Such a property owner could successfully challenge the valuation were she to carry her burden to both show error in the assessment and demonstrate the merits of his competing valuation. *Nelson,* 943 P.2d at 1356. The taxpayer's victory would, however, be won on the battlefield of fair market value. To win an adjustment in valuation under section 59–2–1006(4) without joining a battle over fair market value, a property owner must meet the clear statutory mandate of presenting multiple disparate comparable properties. The property owner cannot have both an absence of comparable properties and freedom from the constraints of the fair market value standard of valuation.

¶ 20 Our discussion of the relationship between multiple "comparable properties" and access to a section 59–2–1006(4) adjustment also speaks to Mountain Ranch's constitutional claims. Article XIII, section 2 of the Utah Constitution mandates the uniform and equal assessment of property. Utah Const. art. XIII, § 2, cl. 1. Mountain Ranch's constitutional argument turns on the same theory that animated its claim to statutory relief: that irrespective of the accuracy of its fair market value assessment, the disparity between its valuation and Glenwild's entitles it to an adjusted valuation commensurate with Glenwild's. Without evidence to establish that another property enjoyed the valuation treatment afforded Glenwild, Mountain Ranch has no basis to support its position that constitutional equality and uniformity may be achieved by reducing Mountain Ranch's valuation.

¶ 21 Accordingly, we affirm the ruling of the Commission.

¶ 22 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Justice PARRISH concur in Justice NEHRING's opinion.