2005 UT 16

**ALLIANT TECHSYSTEMS, INC.,**
**Plaintiff and Appellee,**

v.

**SALT LAKE COUNTY BOARD OF EQUALIZATION and the Utah State Tax Commission, Defendants and Appellees.**

**Lee Gardner in his official capacity as Salt Lake County Assessor and Granite School District, Intervenors and Appellants.**

No. 20030612.

Supreme Court of Utah.

March 11, 2005.

Randall M. Grimshaw, Maxwell A. Miller, Salt Lake City, for Alliant Techsystems, Inc.

John E.S. Robson, J. David Pearce, Salt Lake City, for Granite School District.

Kelly W. Wright, Morgan, for County Assessor.

Mark L. Shurtleff, Att'y Gen., Raymond A. Hintze, Deputy Att'y Gen., John C. McCarrey, Asst. Att'y Gen., Salt Lake City, for Utah State Tax Commission.

J. Craig Smith, Scott M. Ellsworth, Salt Lake City, for County Board of Equalization.

WILKINS, Associate Chief Justice:

¶ 1 The Salt Lake County Assessor, Lee Gardner (the "Assessor"), and Granite School District ("Granite") appeal the decision of a district court tax judge that approved a settlement agreement between Alliant Techsystems, Inc. ("Alliant") and the Salt Lake County Board of Equalization (the "BOE"), wherein the BOE agreed to refund $5 million to Alliant to settle disputes over the amount of taxes Alliant owed for tax years 1995 through 1999. The Assessor also contests the district court's award of attorney fees against him. We reverse.

## BACKGROUND

¶ 2 On December 5, 2000, Alliant and the BOE entered into an agreement to settle several pending tax disputes. The disputes were over the county's tax assessments of Alliant's properties for the years 1995 through 1999, and included multiple cases before two different adjudicative bodies. One of the objects of the settlement agreement was to prevent protracted litigation in those cases. That this matter is before us, some four years later, is evidence that the settlement, at least as an end to litigation, was ineffective. Apart from its effectiveness however, and more fundamentally, we are now asked to consider whether the settlement, as originally designed by the parties, was even legal. This question implicates the rights not only of the parties to the agreement themselves, but also of those who have an interest in the $5 million tax refund contemplated by the settlement, namely, Granite and the Assessor.

¶ 3 To place the issues raised by each of the interested parties in their proper legal context, we will first outline Utah's system for tax assessment and resolution of assessment disputes. We will then rehearse the material facts of the present dispute against that backdrop.

## I. TAX ASSESSMENTS AND ASSESSMENT CONTESTS IN UTAH

¶ 4 The Utah Constitution states that "[a]ll tangible property in the state, not exempt under the laws of the United States, or under this Constitution, shall be taxed at a uniform and equal rate in proportion to its value, to be ascertained as provided by law." Utah Const. art. XIII, § 2, cl. 1; *see also* Utah Code Ann. § 59-2-103 (2004)[1] ("All tangible taxable property shall be assessed and taxed at a uniform and equal rate on the basis of its fair market value, as valued on January 1, unless otherwise provided by law."). Chapter two of title fifty-nine of the Utah Code, the Property Tax Act, Utah Code Ann. §§ 59-2-101 to -1503 (2004), outlines the legal framework designed to fulfill that constitutional mandate.

¶ 5 To assess and tax property at "a uniform and equal rate on the basis of its fair market value," the Property Tax Act provides that a publicly-elected county assessor, Utah Code Ann. § 17-53-101(1)(b) (2001), "shall assess all property located within the county," Utah Code Ann. § 59-2-301. To ensure the accuracy of these assessments, the assessor is required to "annually update property values of property . . . based on a systematic review of current market data. In addition, the county assessor shall complete a detailed review of property characteristics for each property at least once every five years." *Id.* § 59-2-303.1. If the assessor fails to comply with these guidelines or current appraisal standards, his assessments are subject to "corrective action" by the Utah State Tax Commission. *Id.* § 59-2-303.1(1)(a)–(b).

¶ 6 Furthermore, owners of taxable properties may contest the assessor's valuations of those properties. Initially, the proper forum for any such contest is before the county board of equalization. *Id.* § 59-2-1004 (for disputes over real property valuations); *id.* § 59-2-1005 (for disputes over personal property valuations). The county board of equalization is the county legislative body, *id.* § 59-2-1001(1), and is required by statute to "adjust and equalize the valuation and assessment of the real and personal property within the county, subject to regulation and control by the [state tax] commission as prescribed by. law." *Id.* § 59-2-1001(2). In making an application for appeal to the board of equalization, property owners must give their "estimate of the fair market value of the property and any evidence which may indicate that the assessed valuation of the owner's property is improperly equalized with the assessed valuation of comparable properties." *Id.* § 59-2-1004(3).

¶ 7 The board then holds a public hearing on the equalization of the property assessment, *id.* § 59-2-1004(4)(a), whereat the "assessor or any deputy whose testimony is needed shall be present, and may make any statement or introduce and examine witnesses on questions before the board," *id.* § 59-2-1001(5). Any decision to adjust the assessment requires approval of a quorum of board members, *id.* § 59-2-1001(3), and "shall contain a determination of the valuation of the property based on fair market value, and a conclusion that the fair market value is properly equalized with the assessed value of comparable properties." *Id.* § 59-2-1004(4)(d).

¶ 8 Parties dissatisfied with the board's assessment and equalization of any property may appeal the board's decision to the state tax commission. *Id.* § 59-2-1006(1). In reviewing that decision, the commission may consider the minutes of the proceedings before the board, as well as documentary evidence and the transcripts of any testimony presented in those proceedings. *Id.* § 59-2-1006(2)(b). It may also admit any additional

---

1. For purposes of this opinion, we cite current Utah Code sections where the substantive law has remained unchanged since events relevant to this dispute began in 1995. Otherwise, we cite to the then-controlling statutory provisions.

evidence presented by the parties. *Id.* § 59–2–1006(3)(a). Ultimately, the commission may "make any correction or change in the assessment or order of the county board of equalization" by "adjust[ing] property valuations to reflect a value equalized with the assessed value of other comparable properties." *Id.* § 59–2–1006(3)(c), (4).

¶ 9 The next rung on the appellate ladder is an appeal to the district court, which has "jurisdiction to review by trial de novo all decisions issued by the commission." Utah Code Ann. § 59–1–601(1) (2004). Upon request, the parties may bring such appeals before designated "tax judges," district court judges assigned to hear tax cases. Utah R. Jud. Admin. 6–103. However, any further ascent through the appellate process follows ordinary channels of procedure. Utah Code Ann. § 59–1–608.

## II. ALLIANT'S ASSESSMENT CONTESTS

### A. *Initial Tax Disputes*

¶ 10 The agreement between Alliant and the BOE was intended to settle disputes "for tax years 1995 through 1999 .... [and] include[d] all claims in all outstanding actions for those tax years involving real and personal property [and] NIROP." The "outstanding actions" for tax years 1995 through 1999 all relate to contests over the Assessor's valuation of Alliant's property in Salt Lake County, and can be organized into three separate groups.

¶ 11 The first is the "Independent Action" filed by Alliant in district court in February 1998. This action involved statutory and constitutional challenges to the Assessor's assessment of federal property that Alliant operates under control of the United States Navy (the Naval Industrial Reserve Ordinance Plant or "NIROP"). Alliant's complaint sought declaratory relief, alleging that taxation of the NIROP property violated the Constitution and requesting a refund of taxes paid under protest. Alliant also sought injunctive relief against the payment of future taxes on the NIROP property. Nevertheless, it continued to pay the taxes under protest until the case was decided. When

Alliant and the BOE entered into their settlement agreement in December 2000, the matter was still pending before the district tax court.

¶ 12 The second group of cases covers the tax assessments of Alliant's real and personal property for tax years 1995 and 1996 (the "95–96 valuation dispute"). In 1995, Alliant's real property was originally assessed at $168,801,600. On appeal to the board of equalization, Alliant sought to reduce the value assessment to $82,865,641 and the Assessor sought a reduction to $152,725,521. The board upheld the Assessor's reduced assessment. In 1996 Alliant's real property was assessed at $168,003,500. Before the board of equalization, Alliant sought to reduce the assessment to $82,965,641, while the Assessor sought an increase to $253,197,000. Ultimately, the board upheld the Assessor's original valuation.

¶ 13 Alliant appealed these decisions to the tax commission. Before the commission, the real property issues for 1995 and 1996 were separated from the personal property issues for those years. In November 1999, the commission rendered a decision on the real property assessments for both years, sustaining the values established by the board of equalization. Subsequently, Alliant filed multiple Petitions for Review of the commission's decision to the district court. In May 2000, these petitions were consolidated, and the appeal was transferred to tax judge Lynn Davis, before whom was pending the Independent Action involving the same parties. At the time of the settlement between the parties, the real property cases from the 95–96 valuation dispute were pending before the district court while the personal property cases from that dispute remained pending before the tax commission.

¶ 14 The third group of cases includes Alliant's contests over the Assessor's valuations of its real and personal property for tax years 1997 through 1999 (the "97–99 valuation dispute"). Similar to the 95–96 valuation dispute, Alliant appealed the initial assessment of its property to the board of equalization. However, to facilitate the resolution of those appeals, the parties stipulated to a decision by the board that was adverse to

Alliant and upheld the Assessor's original assessments. They then brought the matter before the tax commission where a formal hearing date was set for November 2000. The parties stipulated to a continuance of this hearing, however, in order to discuss a settlement agreement.

### B. The Settlement Agreement and Disputes Arising Therefrom

¶ 15 As stated above, Alliant and the BOE entered into a settlement agreement covering Alliant's tax challenges for the years 1995 through 1999 on December 5, 2000. At that time, the district court had jurisdiction over the Independent Action and the real property cases from the 95–96 valuation dispute. The personal property cases from the 95–96 valuation dispute and the real and personal property cases from the 97–99 valuation dispute, however, were still pending before the tax commission. Consequently, to settle these multiple cases, the agreement was "subject to ... final approval by the Utah State Tax Commission and the District Court."

¶ 16 The settlement terms included a $5 million refund from the BOE to Alliant "in satisfaction of all disputed claims for the years 1995–1999 inclusive." However, the parties considered the refund to be a lump sum, which was not designated to compensate for any specific alleged overvaluation for any of the relevant tax years. According to the language of the agreement,

[n]o obsolescence percentage or amount will be applied to any particular year under appeal and any allocation of a reduction in value to any particular year shall be for refund calculation percentages only and shall be neither indicative nor dispositive with respect to any issue raised in Alliant's appeal.

¶ 17 On December 6, 2000, the day after the BOE and Alliant entered into their agreement, the Salt Lake County Commission met publicly to discuss the settlement agreement. The Assessor and Granite were present and objected to the settlement. They asked the county commissioners to allow the hearing before the tax commission to go forward so that a proper valuation methodology could be established for the 97–99 valuation dispute and subsequent tax years. Nevertheless, at the same meeting, the county commissioners approved the settlement agreement between Alliant and the BOE.

¶ 18 At the time of the agreement, Granite had pending before the tax commission a Motion to Intervene as a matter of right in the 97–99 valuation dispute. The day after the county commission approved the agreement, Granite filed another Motion to Intervene, this time in the 95–96 valuation dispute and the Independent Action pending before the district tax court. On December 13, 2000, the Assessor, who was a named party in the Independent Action in the district court but not in any other appeals, filed a Motion to Intervene in the 97–99 valuation dispute then pending before the tax commission. Two days later Alliant, and the BOE filed with the tax commission and district court a Stipulation of Settlement and Joint Motion for Approval and Entry of an Order Approving Settlement. Two weeks later, the Assessor sought to intervene in the 95–96 valuation dispute cases before the district court.

¶ 19 In March 2001, the tax commission issued its decision on the Joint Motion. It first recognized Granite's Motion to Intervene in light of its "substantial financial interest in any resolution of those cases" and held that Granite was a party to the 97–99 valuation dispute from the time it filed its motion on November 17, 2000. The commission further held that since Granite sought to intervene before Alliant and the BOE had reached their agreement, and since Granite objected to the settlement, the settlement was not a complete agreement of all the necessary parties. The tax commission therefore denied Alliant and the BOE's Motion for Approval of the Settlement without further addressing the merits of the valuation dispute.

¶ 20 Consequently, in April 2001, the tax commission held a formal hearing to determine the best valuation methodology for, and the fair market value of, Alliant's real property for the 1997 through 1999 tax years. It issued its decision on September 18, 2001, concluding that the values of Alliant's real

property for 1997 through 1999 were closer to the Assessor's original assessments than to Alliant's requested reductions. As a result of this decision, the county would only be required to refund approximately $1 million in overassessed taxes, instead of the $5 million contemplated by the settlement agreement.[2]

¶ 21 Two days after the tax commission issued its decision on the 97–99 valuation dispute, the district court tax judge issued an opinion on Alliant and the BOE's Joint Motion for Approval of Settlement that was then pending before it. Although the district court denied the Motion for Approval on technical grounds, it otherwise expressed approval of the settlement.

> While this Court accepts the divisibility of jurisdiction [between the district court and the tax commission], it is of the opinion that the refund amount of $5 million is indivisible and non-allocatable between the various tax years. Therefore, even though this Court disagrees with the legal theory relied upon by the Utah State Tax Commission, the Court has no option but to reluctantly disapprove of the Settlement Agreement. The separately recognized divisibility of jurisdiction does not direct this Court, legally, to adopt a divisibility of the global refund. The rejection decision of the Utah State Tax Commission forces this court to reject a Settlement Agreement which it believes is valid and legally sustainable.

¶ 22 The following day, Alliant filed a Petition for Review of the tax commission's final decision in the 97–99 valuation dispute in Third District Court. In conjunction with that Petition, Alliant moved the district court to transfer the matter to tax judge Lynn Davis, before whom were pending the Independent Action and the real property cases from the 95–96 valuation dispute. Furthermore, by the time the Motion to Transfer was granted in early November, Alliant had voluntarily withdrawn all of its personal property tax appeals pending before the tax commission, so that it had no matters pending before that body, and all relevant disputes over tax years 1995 through 1999 were before Judge Davis.[3]

¶ 23 On November 14, 2001, Alliant requested that the district court amend its September 20, 2001 decision in which it had "reluctantly disapproved" the settlement, asking it to approve the settlement agreement now that it had jurisdiction over all tax disputes relevant to the agreement. After several hearings, the district court approved the settlement agreement between Alliant and the BOE on June 30, 2003.

¶ 24 In addition, the district court awarded attorney fees in favor of Alliant against the Assessor. According to the terms of the agreement, when a party breaches any condition of the settlement, the nonbreaching party is entitled to attorney fees incurred in enforcing the settlement. The district court concluded that since the Assessor was an officer of the county, he was necessarily a party to the agreement; and, since he contested the validity of the agreement instead of seeking to secure its approval, he was a breaching party against whom attorney fees could be assessed.

¶ 25 Granite and the Assessor now bring this appeal from the district court's decision.

---

2. The tax commission's decision in the 95–96 valuation dispute also generated a refund amount much lower than Alliant had alleged was necessary. That amount, approximately $200,000, had already been paid by the county when the parties entered into the settlement agreement.

3. While Judge Davis had jurisdiction over all matters relevant to Alliant's disputes with the Assessor's valuations, only tax years 1995 through 1999 were consolidated for purposes of deciding the enforceability of the settlement agreement. The Independent Action, dealing with Alliant's constitutional challenges to the taxation of its NIROP property, remained separate, as it dealt with tax years beyond the dates of the settlement agreement.

After the parties filed briefs in this appeal, Judge Davis rendered a decision in the Independent Action. Alliant urges us to accept that decision as "supplemental authority," filed pursuant to rule 24(i) of the Utah Rules of Appellate Procedure, in considering the legality of the settlement agreement now before us. We decline to do so. Whether Salt Lake County was permitted to tax Alliant for its use of the NIROP property is clearly distinct from the legal questions raised in the present appeal, which concern the enforceability of the settlement agreement between the parties.

Both parties challenge the validity of the settlement agreement, arguing that it violates Utah constitutional and statutory provisions that require property to be assessed at a uniform and equal rate based on fair market value. The settlement agreement violates these principles, they argue, because it contemplates a lump sum refund and does not settle on a specific fair market value assessment for each of the tax years in question. Since this issue is dispositive of the question of the settlement's validity, we do not address in our analysis the myriad other arguments raised by the Assessor and Granite to contest the settlement's enforceability.

¶ 26 In addition, the Assessor challenges the district court's award of attorney fees against him. Each of these issues will be discussed in turn.

## ANALYSIS

### I. THE SETTLEMENT AGREEMENT IS NOT VALID

¶ 27 Whether the settlement agreement between Alliant and the BOE violates Utah law is a question of law, which we review for correctness. *Esquivel v. Labor Comm'n*, 2000 UT 66, ¶ 13, 7 P.3d 777. Alliant attempts to contort the question raised by the Assessor and Granite into one requiring a deferential standard of review. It contends that since the County Commission, as county executive,[4] has authority to "control and direct the ... settlement of all lawsuits," Utah Code Ann. § 17–53–315(1)(a) (2001), the terms of the settlement are legal unless the parties can show fraud, undue influence, mistake or other factors that would form a basis for invalidating any contract. Accordingly, Alliant argues, this court must grant deference to the district court's conclusion that there was "no evidence that the parties to the Settlement Agreement entered into the agreement based upon inadvertence, improvidence, excusable neglect, inequity, disadvantage, injustice, overreaching, or against sound public policy."

¶ 28 However, Alliant fails to acknowledge that even if the county executive does have authority to "control and direct the ... settlement of all lawsuits," and the settlement was concluded in good faith, the county executive is still prohibited from entering into an agreement violative of the Utah Constitution or Utah Code. Whether the terms of the settlement violate these laws is precisely the issue that the Assessor and Granite, the appellants in this case, ask us to address, and we do so without deference to the district court.

¶ 29 As stated at the outset, under Utah law, property must be taxed "at a uniform and equal rate in proportion to its value." Utah Const. art. XIII, § 2, cl. 1. Our constitution requires that the legislature establish the property assessment rate "according to [the property's] value in money," Utah Const. art. XIII, § 3, cl. 1, which the legislature has defined as the property's "fair market value," Utah Code Ann. § 59–2–103 (2004). We have held:

> It is evident that the term 'according to its value in money' [article XIII, section 2] means that all property shall be valued, for the purposes of assessment, as near as is reasonably practicable, at its full cash value; in other words, that the valuation for assessment and taxation shall be, as near as reasonably practicable, equal to the cash price for which the property valued would sell in the open market, for this is doubtless the correct test of the value of property.

*Kennecott Copper Corp. v. Salt Lake County*, 799 P.2d 1156, 1159–60 (Utah 1990) (quoting *Cunningham v. Thomas*, 16 Utah 86, 50 P. 615, 615–16 (1897)); *see also Mountain Ranch Estates v. Utah State Tax Comm'n*, 2004 UT 86, ¶ 12, 100 P.3d 1206 ("The hallmarks of these constitutional and statutory directives are the notions of uniformity, equality, and a universal measure of valuation—fair market value."). Furthermore, to ensure "that every person and corporation ... pay a tax in proportion to the value of

---

**4.** December 2000, the month that the settlement agreement was approved by the county, was the final month the County Commission served as county executive in Salt Lake County. In January 2001, Salt Lake County began its transition to the mayor-council form of government outlined in Utah Code section 17–52–504, where the county mayor serves as county executive.

his, her, or its tangible property," Utah Const. art. XIII, § 3, cl. 1, "the market or cash value of all property must be ascertained and used as the common denominator for all assessments," *Kennecott Copper*, 799 P.2d at 1159.

¶ 30 The settlement agreement between Alliant and the BOE clearly violates these constitutional and statutory requirements. It does so by its express terms, stating that "any allocation of a reduction in value to any particular year shall be for refund calculation percentages only and shall be neither indicative nor dispositive with respect to any issue raised in Alliant's appeal." By refusing to settle on a fair market value determination for each of the tax years in dispute, the agreement between Alliant and the BOE explicitly eliminates the "common denominator" necessary for taxation in Utah. This upsets not only Alliant's ability to "pay a tax in proportion to the value of ... its tangible property," Utah Const. art. XIII, § 3, cl. 1, but also the board of equalization and tax commission's ability to properly equalize "the assessed valuation of comparable properties," Utah Code Ann. § 59-2-1004(3); *id.* § 59-2-1006(4).

¶ 31 However, we hasten to note that the fair market value requirement neither bars nor discourages settlement of valuation disputes, even for cases involving multiple tax years, as long as those settlements comport with Utah law. In *Cache County v. Property Tax Division*, 922 P.2d 758, 761 (Utah 1996), for example, we upheld a tax settlement agreement between the property tax division of the tax commission and Questar Gas that covered five years of disputed assessments. For the settlement in that case, the property tax division and Questar agreed to a separate assessment value for each of the five tax years that represented a "reasonable value of Questar's gas utility property for property tax purposes." *Id.* Several counties that received a portion of Questar's taxes objected to the settlement. *Id.* at 760-61. One basis for their objection was that the agreed-upon amounts for each year of the settlement did not reflect fair market value, in violation of the Utah Constitution, because they were merely "reasonable" assessment values. *Id.*

at 761. However, we upheld the agreed-upon valuations in light of testimony by the property tax division's appraisal expert that the settlement assessments "fell within a reasonable range of fair market value," and because the contesting counties failed to show that the claimed error in the adjusted settlement assessments was material. *Id.* at 765.

¶ 32 Our decision in *Cache County* is significant to the matter before us in at least two respects. First, it demonstrates our willingness to uphold tax settlements that comply with the requirements of Utah tax law. Second, it highlights an essential aspect of any tax settlement, noticeably absent from the settlement agreement before us now: an agreed-upon assessment value for each tax year in question that reflects fair market value. Since the agreement between Alliant and the BOE fails to fulfill this fundamental requirement, we hold that the settlement agreement is unenforceable and reverse the district court's order approving the agreement.

## II. THE ASSESSOR IS NOT LIABLE FOR ATTORNEY FEES

¶ 33 The second issue in this appeal is whether the Assessor is liable for breach of the settlement agreement, to which he continuously objected, simply because he is an officer of the county. The Assessor's authority to contest the county's tax decisions is a question of law that we review for correctness. *Kimball Condos. Owners Ass'n v. County Bd. of Equalization*, 943 P.2d 642, 645 (Utah 1997). Our decision in this matter necessarily implicates the district court's conclusion that the Assessor, as a breaching party to the settlement agreement, owes attorney fees to Alliant.

¶ 34 Utah law clearly allows for a county tax assessor to argue cases before the county board of equalization, Utah Code Ann. § 59-2-1001(5), to appeal the board's decisions to the state tax commission, *id.* § 59-2-1006(1), and to appeal that decision up through the appellate courts, *id.* § 59-1-602. In *Kimball Condominiums*, we concluded that these provisions, which allow the assessor to contest

the board's actions, protect important public policy:

> [I]f the assessor had no right of appeal from board of equalization decisions, many decisions would be insulated from review altogether. Certainly, taxpayers who successfully contest an assessment would have no reason to appeal, if a board of equalization erred in construing constitutional or statutory provisions in the taxpayer's favor. In that case, the decision would stand because there would be no one who both would and could appeal. Consequently, the constitutional requirements that assessments be both uniform and represent fair-market value would be undermined.

943 P.2d at 647. These same policy considerations are implicated in the case before us. By allowing the BOE to bind the Assessor to its settlement agreement and making the Assessor liable to Alliant for attorney fees for contesting the BOE's decisions, we would be undermining the Assessor's ability to achieve assessments at fair market value and removing an important check on the fallible process of property valuation. Therefore, we conclude that the Assessor, although an officer of the county, was not a party to the settlement agreement, and that he cannot be penalized with attorney fees for challenging its validity. Accordingly, we reverse the district court's order awarding attorney fees against him.

### CONCLUSION

¶ 35 Inasmuch as the settlement agreement between Alliant and the BOE fails to settle on an appropriate fair market value determination for each of the tax years covered by the agreement, it violates fundamental constitutional and statutory provisions governing tax law in Utah. We hold that the settlement agreement is unenforceable as such, and we reverse the district court's order approving the agreement. We also reverse the district court's order awarding attorney fees against the Assessor, who, although an officer of the county, was not a party to the agreement against whom attorney fees could be assessed for breach.

¶ 36 Chief Justice DURHAM, Justice DURRANT, Justice PARRISH, and Justice NEHRING concur in Associate Chief Justice WILKINS' opinion.