2005 UT 73

SUMMIT WATER DISTRIBUTION COM-
PANY, a Utah non-profit corporation;
et al., Plaintiffs and Appellants,

v.

SUMMIT COUNTY; Summit County
Commission; Mountain Regional Water
Special Service District, a body politic of
the State of Utah; Patrick D. Cone,
Shauna L. Kerr, Eric D. Schifferli,
County Commissioners; Douglas Evans,
Employee and President of Mountain
Regional Water Special Service District;
Montgomery Watson Harza, a Califor-
nia corporation and its employee and
agent, William Todd Jarvis, an individu-
al; and John Does 1–10, Defendants and
Appellees.

No. 20040033.

Supreme Court of Utah.

Nov. 4, 2005.

438

Robert S. Campbell, Scott M. Lilja, Clark K. Taylor, Jennifer Anderson, John F. Flynn, Salt Lake City, for appellants.

Jody K. Burnett, George A. Hunt, Robert C. Keller, Michael D. Zimmerman, Kimberly Neville, Salt Lake City, David L. Thomas, Coalville, for appellees.

Mark L. Shurtleff, Att'y Gen., Annina M. Mitchell, R. Wayne Klein, Asst. Att'ys Gen., for Attorney General amicus.

Mark K. Buchi, Greggory J. Savage, Richard D. Flint, Salt Lake City, for Intermountain Power Agency amicus.

DURHAM, Chief Justice:

¶ 1 The appellants brought suit against Summit County, a county-created water service district, and related parties, alleging antitrust violations under section 76–10–914 of the Utah Antitrust Act and Article XII, Section 20 of the Utah Constitution. The district court dismissed these claims on the basis that the appellees were exempt from the Antitrust Act under Utah Code section 76–10–915(1)(f) and that the constitutional antitrust provision is not self-executing. The appellants challenge the district court's analysis of both issues on appeal. Because we hold that the appellees' alleged anticompetitive activities do not qualify as acts of a "municipality" that are "authorized or directed by state law" under section 76–10–915(1)(f), and that the appellees are therefore not entitled to the statutory exemption, we do not reach the issue concerning the interpretation of Article XII, Section 20.

## BACKGROUND

¶ 2 When reviewing a district court's grant of a motion to dismiss, "we accept the factual allegations in the complaint as true and interpret those facts and all reasonable inferences drawn therefrom" in the light most favorable to the plaintiff as the nonmoving party. *Russell Packard Dev., Inc. v. Carson*, 2005 UT 14, ¶ 3, 108 P.3d 741. We recite the facts of this case accordingly.

¶ 3 Appellant Summit Water Distribution Company (Summit Water) is a private nonprofit corporation that distributes culinary water for commercial and residential use to its shareholders within the unincorporated portion of the Snyderville Basin in Summit County. In January 2000, Summit Water was the leading competitor among eleven water companies that operated in the Sny-

derville Basin. In February 2000, Summit County (the County) adopted an ordinance renaming an existing special service district as the Mountain Regional Water Special Service District (Mountain Regional), and naming the County's Board of County Commissioners as Mountain Regional's governing board. The goal of the resolution was to establish Mountain Regional as a Snyderville Basin-wide water service district. At that time, Mountain Regional had 5.7% of the market in Snyderville Basin while Summit Water had 34%. Shortly afterwards, Mountain Regional hired William Todd Jarvis—an employee of Montgomery Watson Harza, a California corporation—to provide water engineering services on an independent contractor basis. At around the same time, the County also hired Jarvis to perform water concurrency ratings of culinary water companies. These ratings purported to measure a water company's capacity to supply water to county residents. The County also passed new concurrency ordinances that required developers seeking building permits or planning and zoning approvals to prove they had obtained a commitment from a water company with a sufficient concurrency rating to provide water to their developments.[1] According to Summit Water, the County used the arrangement with Jarvis, in conjunction with the new concurrency ordinances, to ensure that Mountain Regional would have a competitive advantage in seeking new water connections.

¶4 Summit Water also faced a tax assessment increase, from $5000 to nearly $60,000, and the County Commission denied its appeal from that assessment. Summit Water

was also forced to engage in an extended dispute with Jarvis over its concurrency rating while Mountain Regional faced no such difficulties. Meanwhile, Mountain Regional also sought, ultimately unsuccessfully, to acquire Summit Water's water infrastructure through eminent domain proceedings. As of September 2001, Mountain Regional had acquired all but three of the water companies operating in the Snyderville Basin.

¶5 In September 2001, Summit Water and a number of its shareholders (collectively, Summit Water appellants) brought suit against the County, the County Commission, Mountain Regional, Montgomery Watson Harza, and a number of their officers and employees (collectively, County appellees), alleging that these entities and individuals had conspired in restraint of trade and in an attempt "to monopolize the culinary water product market in the Snyderville Basin geographic market." As subsequently amended in March 2002, the complaint specifically alleged that the County appellees had "conspired, agreed, and combined to unlawfully tie the sale, distribution and delivery of [Mountain Regional] water to [the grant of] building permits and planning approvals, fix prices, [engage in] other restraints of trade and impair competition," and had engaged in "illegal conspiracies, combinations and arrangements by anti-competitive conduct" in order to gain a monopoly over culinary water distribution in the Snyderville Basin, all in violation of both the Utah Antitrust Act, Utah Code Ann. §§ 76–10–911 to –926 (2003), and Article XII, Section 20 of the Utah Constitution.[2] For these alleged antitrust viola-

1. A temporary concurrency ordinance, ordinance 385, adopted on May 15, 2000, was soon replaced with a permanent ordinance, ordinance 400, which was then replaced with ordinance 415, which imposed similar requirements. Theoretically, a concurrency law is intended to require "a developer applying for a building permit [to] show the local governing body that the demands of the proposed development will not exceed the maximum capacity of public facilities." Adam Strachan, Note, *Concurrency Laws: Water as a Land–Use Regulation*, 21 J. Land Resources & Envtl. L. 435, 435 (2001).

2. The complaint also alleged violations of Article I, Sections 7 and 24 of the Utah Constitution and the Due Process and Equal Protection Clauses of

the United States Constitution. The district court granted the Summit Water appellants' motion for partial summary judgment on their due process claims in May 2002. In so doing, the court declared unconstitutional county ordinances 400 and 415, which had imposed requirements on developers to form agreements with water companies having sufficient water concurrency ratings. The court reasoned that an appearance of unfairness arose from the facts that the ordinances designated the Board of County Commissioners—also Mountain Regional's governing board—as the body hearing appeals of water concurrency ratings, and that Jarvis was the County's concurrency officer as well as a Mountain Regional employee. The district court's May 2002 order is not before us on ap-

tions, the Summit Water appellants sought injunctive relief against all County appellees and compensatory and treble damages against Montgomery Watson and Jarvis.

¶ 6 The County appellees filed a rule 12 motion to dismiss. The district court denied this motion in relevant part in an order issued March 4, 2002, and this court denied the appellees' petition for interlocutory appeal. The district court based its denial on its conclusions that Article I, Section 26 of the Utah Constitution was a self-executing provision, that the state action immunity doctrine enunciated in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), did not apply to actions under state antitrust laws, and that Utah Code section 76–10–915(1)(f), which exempts "municipalities" from the state antitrust act, did not apply here because "[n]either a county nor its special service districts are municipalities."

¶ 7 After discovery was underway, the County appellees, in January 2003, filed a motion to reconsider and to dismiss, which the district court construed as a motion to dismiss under rule 12(b)(6) of the Utah Rules of Civil Procedure. The district court issued an order on May 27, 2002, in which it reevaluated its prior legal conclusions in light of the constitutional and legislative historical evidence newly submitted by the County appellees. Based on its review of those materials, the district court concluded that Article XII, Section 20 was not, in fact, self-executing but was meant rather as a "strong policy statement to guide future legislative action" so as to "guard against ... dilut[ion] or eliminat[ion] [of] the Antitrust Act in a changed political climate." The court therefore dismissed the Summit Water appellants' claims based on Article XII, Section 20.

¶ 8 The court then reconsidered its conclusion that counties and special service districts were not included within the "municipality" exemption contained in Utah Code section 76–10–915. While confirming that by its plain meaning the term "municipality" referred only to a city, the court determined that the legislative intent behind the municipality exemption could not be discerned based on plain meaning alone when the legislative history submitted by the County appellees cast " 'doubt or uncertainty' ... [on] the scope of the otherwise unambiguous term 'municipality.' " Reviewing the debate on the floor of the Utah Senate regarding the insertion of the municipality exemption into the Antitrust Act, the court considered significant the statement of Senator Thorpe Waddingham, who supported his floor amendment introducing the exemption by referring explicitly to the then-recently-decided United States Supreme Court case, *City of Lafayette v. Louisiana. Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978).[3]

¶ 9 Based on this history, the court concluded that the term "municipality," as used in the Act, "must include *all* units of local government within its rubric." The court then gave the Summit Water appellants twenty days to further amend their complaint by "in good faith identify[ing] anticompetitive activities on the part of any one of the foregoing defendants that were not 'authorized or directed by state law,' " which under Utah Code section 76–10–915(1)(f) would exclude the County appellees from the scope of the municipality exemption. The court directed that, failing such amendment, the Summit Water appellants' statutory

peal. According to the County appellees, the County has since revised its ordinance to designate a state district engineer as the concurrency officer and to remove the county commission from the appeal process. Summit Water's challenge to its concurrency rating under the new ordinance is on appeal in a separate action, *Summit Water v. Mountain Regional*, 2005 UT App 66, 108 P.3d 119

3.  As quoted by the district court, Senator Waddingham stated that

   [o]ne of the reasons is the legislation we passed two years ago dealing with [the Intermountain

Power Project]. And a recent federal case, that I have not read, but which has been called to my attention, that in some cases makes municipalities comply with certain sections of the federal antitrust legislation. This—one of the purposes, which I hope that this particular amendment would accomplish was to remove any question as to whether or not its' [sic] a[t] variance with the Interlocal Cooperation Act that we passed two years ago.

Floor Debate, 43rd Utah Leg., Gen. Sess., Feb. 5, 1979 (statement of Sen. Waddingham).

claims under the Antitrust Act be dismissed as well.

¶ 10 The Summit Water appellants then filed a motion for reconsideration, arguing that the district court erred in its legal analysis of the foregoing issues and in placing on the appellants the burden of pleading that the County appellees' actions were not authorized or directed by state law. In a January 5, 2004 order, the district court denied this motion, clarifying its conclusion that "for an activity to satisfy the 'authorized or directed' requirement in section 76–10–915(1)(f) of the Utah Code it is necessary only that a political subdivision act pursuant to general state statutes." The court determined that because the Summit Water appellants had failed to "allege conduct that is not described in section 76–10–915(1)(f)," they had failed to state a claim under the Antitrust Act. The court then dismissed all remaining claims of the Summit Water appellants.

¶ 11 The Summit Water appellants appealed the district court's final ruling, and the appeal was transferred to this court pursuant to Utah Rule of Appellate Procedure 43. This court has jurisdiction pursuant to Utah Code section 78–2–2(3)(b) (2002).

## STANDARD OF REVIEW

¶ 12 The district court's determination that a plaintiff's complaint "fail[ed] to state a claim upon which relief can be granted," leading the court to grant the defendant's motion to dismiss under rule 12(b)(6) of the Utah Rules of Civil Procedure, is a legal conclusion that we review for correctness. *Foutz v. City of S. Jordan*, 2004 UT 75, ¶ 8, 100 P.3d 1171. Here, specifically, we review for correctness the district court's interpretation of Utah Code section 76–10–915, *id.*

## ANALYSIS

¶ 13 The Summit Water appellants argue that (1) the district court erred in dismissing their claims under the Utah Antitrust Act, Utah Code Ann. §§ 76–10–911 to –926 (2003), because the "municipality" exemption in Utah Code section 76–10–915(1)(f) exempts only cities from the provisions of the Act and therefore would not exempt any of the County appellees, and because the further requirement under that section that the appellees' activities be "authorized or directed by state law" also does not apply; (2) the district court erred in requiring the Summit Water appellants to plead specific conduct by the County appellees that was not "authorized or directed by state law" because the municipality exemption is an affirmative defense to an Antitrust Act claim; and (3) the district court erred in dismissing their constitutional claims because Article XII, Section 20 is an enforceable, self-executing provision. The Summit Water appellants concede that if we decide in their favor on their statutory claims, we need not address their constitutional arguments. The County appellees disagree, suggesting that we must in any case resolve the Summit Water appellants' "conten[tion] that Article XII, Section 20 trumps all the liability and damage limitations in the 1979 Act." We first examine the statutory issues.

## I. THE "MUNICIPALITY" EXEMPTION TO THE UTAH ANTITRUST ACT

¶ 14 Utah Code section 76–10–914 defines illegal anticompetitive activities for purposes of the Utah Antitrust Act:

(1) Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce is declared to be illegal.

(2) It shall be unlawful for any person to monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize, any part of trade or commerce.

Utah Code Ann. § 76–10–914 (2003). Section 76–10–915 exempts from this definition "the activities of a municipality to the extent authorized or directed by state law." *Id.* § 76–10–915(1)(f). Thus, in order for a party's activities to be exempt under section 76–10–915(1)(f) from an antitrust claim, the party must be a "municipality" and its activities must have been "authorized or directed by state law." *Id.* As described above, the district court held that both of these require-

ments were met in the case of the County appellees. The Summit Water appellants challenge its conclusion on both counts. We address each of the exemption's two requirements in turn.

### A. Whether the County Appellees Are "Municipalities" Under Utah Code Section 76–10–915(1)(f)

¶ 15 The Summit Water appellants argue that the district court's interpretation of the word "municipality" in section 76–10–915(1)(f) to include a county, a special service district, and a private California corporation is contrary to settled principles of statutory construction, which require reliance on a word's plain meaning unless there is ambiguity. They contend that the term plainly refers to municipal corporations only—in other words, cities and towns—and that such an interpretation is in accord with a general mandate to interpret exemptions from antitrust laws narrowly.

¶ 16 The County appellees respond that the term "municipality" is ambiguous on its face when considered in light of conflicting definitions of the term in other statutory enactments. Furthermore, in their view, the context in which the municipality exemption was added to the Antitrust Act, together with the Antitrust Act's direction in section 76–10–926 to refer to federal law when interpreting the Act, indicates an intent by the legislature to include all units of local government within the exemption. They further contend that a narrow interpretation of the term would lead to conflict between the Antitrust Act and the Interlocal Cooperation Act, Utah Code Ann. §§ 11–13–101 to –314 (2003 & Supp.2004), insofar as the latter authorizes the creation and continuing existence of the Intermountain Power Agency (IPA), an entity formed through the cooperation of twenty-three Utah cities and towns for the purpose of constructing and operating the Intermountain Power Project (IPP).

¶ 17 It is well settled in this court that our goal when interpreting a statute "is to give effect to the legislative intent, as evidenced by the [statute's] plain language, in light of the purpose the statute was meant to achieve." *Foutz v. City of S. Jordan*, 2004

UT 75, ¶ 11, 100 P.3d 1171 (internal quotation omitted). When evaluating the plain language of a particular statutory provision, we interpret it "in harmony with other statutes in the same chapter and related chapters." *Mountain Ranch Estates v. Utah State Tax Comm'n*, 2004 UT 86, ¶ 11, 100 P.3d 1206 (internal quotation omitted). However, "[i]f we find ambiguity in the statute's language, we look to legislative history and other policy considerations for guidance." *ExxonMobil Corp. v. Utah State Tax Comm'n*, 2003 UT 53, ¶ 14, 86 P.3d 706.

¶ 18 Here, the parties' dispute over the interpretation of the term "municipality" in section 76–10–915(1)(f) implicates the broader question of how ambiguity in a statute's language is to be identified. As indicated above, the district court originally determined that the word "municipality" unambiguously referred only to cities and towns. In its May 27, 2002 order, the court repeated that, in the absence of the legislative history materials submitted by the County appellees, it would continue to adhere to that conclusion. Its ultimate decision to the contrary was entirely based on the additional materials submitted that, in the district court's view, indicated a legislative intent that was not apparent on the face of the statute itself.

¶ 19 We first consider whether we agree with the district court that the term "municipality," on its face, unambiguously refers only to cities and towns. The district court concluded that "[n]owhere has this court been able to find a definition or use of the term 'municipality' in Utah statute or constitution that, from its plain meaning, one could read as anything other than a city. Or, conversely, that one could stretch to embrace a county or its special service district." Based on our examination of the Utah Code and Constitution, there is no question that the word "municipality" is used almost exclusively to refer to municipal corporations—cities and towns. It is true, as the County appellees point out, that the former Utah Municipal Bond Act explicitly defined "municipality" to "include[ ] cities, towns, counties, school districts, public transit districts, and improvement districts ..., special service districts ..., metropolitan water dis-

tricts ..., irrigation districts ..., water conservancy districts ..., and regional service areas." Utah Code Ann. § 11–14–1(1) (2003) (repealed 2005). The provision clarified that that definition applied only "for the purpose of th[e] [Municipal Bond Act]." *Id.* The County appellees urge us to consider this definition as sufficient indication that the word "municipality" is ambiguous on its face. However, the fact that the legislature in 2005 saw fit, when amending the Act, to replace the term "municipality" with the term "local political subdivision," *see* ch. 105, 2005 Utah Laws § 9 (codified at Utah Code Ann. § 11–14–102(3)), may suggest the legislature's own acknowledgment that the former broad definition of "municipality" was not in accord with the term's generally accepted meaning.

¶ 20 The only other instance in which a Utah Code provision defines the term "municipality" to include "any county ... or political subdivision of this state" is in section 72–10–301(4) of the Aeronautics Act, Utah Code Ann. §§ 72–10–101 to –504 (2001 & Supp.2004). A review of the Aeronautics Act in its entirety suggests that this definition was inserted only to simplify the later definition of "public agency" in the same provision, *see id.* § 72–10–301(6) (including "municipalities" in the definition of "public agency"), for, despite the inclusion of counties in that definition of municipality, other provisions in the same part of the chapter list both counties and municipalities in a manner that suggests they are separate entities, *see id.* §§ 72–10–303, –304.

¶ 21 If our review were restricted to the occurrences of the word "municipality" in the Utah Code and Constitution, we would be inclined to agree with the district court that the term on its face unambiguously refers only to municipal corporations. We do not end our analysis here, however, because, as the County appellees point out, the Antitrust Act expressly provides that "[t]he Legislature intends that the courts, in construing this act, will be guided by interpretations given by the federal courts to comparable federal antitrust statutes and by other state courts to comparable state antitrust statutes." *Id.* § 76–10–926. Based on this direction, we must examine antitrust law as a whole in order to determine whether the term "municipality" means something other than a municipal corporation when used in the antitrust context.

¶ 22 The federal antitrust law, the Sherman Act, exempts "local governments" from damage and attorney's fee penalties for federal antitrust violations. 15 U.S.C. § 35(a). The Act defines "local government" as including "a city, county, parish, town, township, village, or any other general function governmental unit established by State law," *id.* § 34(1)(A), as well as "a school district, sanitary district, or any other special function governmental unit established by State law in one or more States," *id.* § 34(1)(B). The Sherman Act thus uses the term "local government" to mean what the County appellees argue the term "municipality" means in the Utah statute. These provisions therefore do not support the County appellees argument. Congress, however, added these provisions to the Sherman Act in 1984, Local Government Antitrust Act of 1984, Pub.L. No. 98–544, 98 Stat. 2750 (1984) (codified at 15 U.S.C. §§ 34–36), and the County appellees argue that Congress made this amendment in response to the United States Supreme Court's interpretation of the Sherman Act in a line of cases that served to limit the immunity of local governments from federal antitrust liability. We therefore examine these cases in order to determine whether they support the County appellees' proposed interpretation of the word "municipality."

¶ 23 We agree that the United States Supreme Court has interpreted the Sherman Act, prior to its 1984 amendment, as applying on its face to all local governmental entities. *City of Lafayette v. La. Power & Light Co.,* 435 U.S. 389, 396–98, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978) (recognizing that the term "person" in the Sherman Act included all entities, whether public or private, that "engaged in business whose activities might restrain or monopolize commercial intercourse among the states" and thus included both states and cities (internal quotation omitted)). In reaching this interpretation, the Court emphasized the strong federal policy in favor of a "regime of competition," such that "the antitrust laws will not be displaced

unless [they] ... are plainly repugnant" to a "regulatory regime over an area of commercial activity." *Id.* at 398, 98 S.Ct. 1123. The Court then indicated that implied exclusions from the Act were disfavored. *Id.* at 399, 98 S.Ct. 1123. Reasoning that local governments serve parochial rather than national interests, the Court then concluded that

> [w]hen these bodies act as owners and providers of services, they are fully capable of aggrandizing other economic units with which they interrelate, with the potential of serious distortion of the rational and efficient allocation of resources, and the efficiency of free markets which the regime of competition embodied in the antitrust laws is thought to engender.

*Id.* at 408, 98 S.Ct. 1123.

¶ 24 Unlike local governments, however, states themselves are coequal sovereigns with the federal government. *Id.* at 411–13, 98 S.Ct. 1123. On that basis, the Court has interpreted the Sherman Act as implicitly excluding states from its application. *Id.* at 400, 98 S.Ct. 1123 (citing *Parker v. Brown,* 317 U.S. 341, 351, 63 S.Ct. 307, 87 L.Ed. 315 (1943)). In *City of Lafayette,* a plurality of the Court further recognized that a local government falls within the *Parker* exemption when it acts as an agent of the state, "pursuant to state policy to displace competition with regulation or monopoly public service." *Id.* at 413, 98 S.Ct. 1123 (plurality). The standard set forth by the *City of Lafayette* plurality was subsequently adopted by the Court. *Cmty. Communications Co. v. City of Boulder,* 455 U.S. 40, 51, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982). Later cases have adhered to this general principle. *See Fed. Trade Comm'n v. Ticor Title Ins. Co.,* 504 U.S. 621, 636–37, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992); *City of Columbia v. Omni Outdoor Adver., Inc.,* 499 U.S. 365, 372–73, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991); *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 45, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985).

¶ 25 We agree with the County appellees that this line of cases provides interpretative guidance in this context, but we disagree concerning its import. We are unpersuaded that the United States Supreme Court's use of the specific term "municipality" in some instances where the enunciated principles applied equally to other units of local government indicates that the term is ambiguous or has a different meaning in the antitrust context, particularly where the entities at issue in the cases reviewed by the Court were in fact cities, as indicated in the case names above. Far from establishing that antitrust law in general uses the word "municipality" broadly, the County appellees have failed to point to a single instance where a court referred to a specific unit of local government as a "municipality" unless it was in fact a city or a town.

¶ 26 Moreover, we believe that the mandate in our Antitrust Act that we be guided by other courts' interpretations requires us to rely on the principles underlying those interpretations, rather than on the courts' particular word choice. When we examine the issue before us in that light, it becomes clear that the County appellees are asking us to engage in rather curious logic. They propose that, because the Court in the *City of Lafayette* line of cases held that the Sherman Act *applies* to all local governmental entities, unless they are acting as agents of the state, our Legislature must have intended to *exempt* all local governmental entities when they added the municipality exemption to Utah's Antitrust Act. Further, the County appellees repeat the argument, made before the district court, that the municipality exemption's purpose was to avoid incorporating the Court's decision in *City of Lafayette* into Utah antitrust law. Thus, according to the County appellees, we must follow the mandate that we rely on federal caselaw when interpreting the term "municipality" even as we recognize that the Legislature intended to circumvent the very federal caselaw that we are urged to follow. We decline to engage in such a tortured analysis.

¶ 27 The only remaining factor militating against the conclusion that the term "municipality" unambiguously refers only to municipal corporations is Senator Waddingham's statement in the floor debates, indicating his concern, when proposing the municipality exemption, about the impact of the *City of Lafayette* decision on the IPP. The extent to

which an individual statement by a legislator is a reliable indicator of legislative intent has frequently been questioned. *E.g., Wood v. Univ. of Utah Med. Ctr.*, 2002 UT 134, ¶ 19, 67 P.3d 436 ("Legislators may decide that a statute should be passed for myriad, often even different, reasons...."). Moreover, it is far from clear to us that legislative history should be relevant when making the initial determination of whether a statutory provision is ambiguous on its face. *See Berube v. Fashion Ctr.*, 771 P.2d 1033, 1038 (Utah 1989) (agreeing that the statute at issue "is clear on its face and should be applied accordingly, regardless of any specific intent formed by a particular legislator"). At the same time, because our primary goal is to interpret statutes in accord with legislative intent, we might hesitate to disregard entirely such an indication of intent where it was clear, even if a provision appears to be unambiguous.[4] We do not believe Senator Waddingham's statement qualifies as such a clear indication of intent, however. The statement indicates that Senator Waddingham had not read *City of Lafayette*, and though the Senator specifically mentions the IPP, he does not indicate that he considers the IPP itself, or its owner, the IPA, to be a "municipality" that would be subject to antitrust legislation in the absence of the proposed exemption. Rather, Senator Waddingham, in stating that the exemption's purpose is "to cause actions taken by municipalities ... to be on the same card as activities conducted by utilities," uses the term "municipalities" himself, making it difficult to conclude that he accorded the word a meaning other than the generally accepted definition of "municipal corporation."

¶ 28 Thus, as the Summit Water appellants suggest, Senator Waddingham's language is simply too vague to draw specific conclusions on these matters from his statements alone. It seems that, in order to accord Senator Waddingham's statement the significance that the County appellees suggest it de-

serves, we would have to engage in a full analysis of whether the IPA and IPP are otherwise subject to Utah's Antitrust Act and, if so, whether the legislature intended these entities to be free to engage in anticompetitive activities. Although the IPA, in its role as amicus in the present case, argues that both of these questions must be answered in the affirmative, and indeed that the municipality exemption was constructed with it specifically in mind, we are unwilling to undertake such a review when the IPA's status and activities are not actually at issue in the case before us.

■ ¶ 29 Moreover, we believe the district court erred in according Senator Waddingham's statement such weight without considering the proper import of other interpretive principles in the antitrust context. We adhere to the fundamental principle underlying the Court's decision in *City of Lafayette*—that antitrust laws must be interpreted in light of the strong public policy disfavoring anticompetitive practices. *City of Lafayette*, 435 U.S. at 398, 98 S.Ct. 1123. Indeed, our deference to this policy must be particularly strong in light of Article XII, Section 20 of our state constitution as well as the Legislature's explicit finding, set forth in the Antitrust Act itself, that

> competition is fundamental to the free market system and that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic, political and social institutions.

Utah Code Ann. § 76–10–912. Based on this policy,[5] we have previously indicated that provisions of our Antitrust Act must be strictly construed in favor of competition and that, therefore, "exemptions [from the Act]

---

4. In one treatise author's opinion, "[b]ecause issues concerning what a statute means or what a legislature intended are essentially issues of fact, even though they are decided by the judge and not by a jury, a court should never exclude relevant and probative evidence from consideration." 2A Norman J. Singer, *Statutes and Stat-*

*utory Construction* § 45:02, at 14–15 (6th ed.2000).

5. By referring to such a "policy," we express no opinion on the question of whether Article XII, Section 20 is self-executing.

should be construed narrowly." *Evans v. State,* 963 P.2d 177, 185 (Utah 1998); *see also Group Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 231, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979) ("It is well settled that exemptions from the antitrust laws are to be narrowly construed. This doctrine ... applies with equal force to express statutory exemptions."). Thus, even if we were to conclude that the term "municipality" in section 76–10–915(1)(f) is ambiguous, this interpretive principle suggests that we adopt the narrowest possible meaning of the term, limiting it to municipal corporations. *See Evans,* 963 P.2d at 185.

¶ 30 For the reasons set forth above, we cannot conclude that the term "municipality" in section 76–10–915(1)(f) is ambiguous, nor, if it were ambiguous, would we be likely to interpret the term broadly. However, we acknowledge that we are unable to perceive any logical reason for including cities and towns in the municipality exemption but excluding other units of local government. In the interest of judicial caution, therefore, we reserve an ultimate decision on the meaning of "municipality" for another day and proceed to analyze whether, assuming the County appellees would qualify as municipalities, their activities at issue here are exempt because they were "authorized or directed by state law" for purposes of Utah Code section 76–10–915(1)(f).

### B. Whether the County Appellees' Activities Are Authorized or Directed by State Law

¶ 31 Section 76–10–915(1)(f) exempts municipalities from operation of the Antitrust Act only insofar as their activities are "authorized or directed by state law." Utah Code Ann. § 76–10–915(1)(f). As described above, the district court concluded that a municipality satisfies this condition as long as it acts "pursuant to general state statutes." The Summit Water appellants argue that this broad interpretation of the "authorized or directed" language is contrary to the *City of Lafayette* line of cases and that the requirement is not satisfied here by general laws that give no indication that the state authorizes counties to "monopolize a private water market." The County appellees, in turn,

maintaining their position regarding the purpose of the municipality exemption, argue that to interpret section 76–10–915(1)(f) in accord with *City of Lafayette* is to "incorporate[ ] *into* the Utah Antitrust Act precisely what the legislative history indicates that section was intended to keep *out* of the Act— the narrow *City of Lafayette* reading of local government immunity from antitrust [claims]." They further argue that their activities would be exempt under current federal law, as it has developed in the twenty-seven years since *City of Lafayette.*

¶ 32 In accord with Utah Code section 76–10–926, we first examine federal law on this issue. Again, the principle first set forth by the *City of Lafayette* plurality and subsequently adopted by a majority of the United States Supreme Court is that a unit of local government is exempt from federal antitrust laws only if its "anticompetitive conduct [is] engaged in as an act of government by the State as sovereign, ... pursuant to state policy to displace competition with regulation or monopoly public service." *City of Lafayette,* 435 U.S. at 413, 98 S.Ct. 1123 (plurality). The basis for this holding was the doctrine of dual sovereignty, under which, according to the plurality, "state action" is exempt from federal antitrust laws. *Id.* at 412, 98 S.Ct. 1123. The plurality stated that, in order for a state's subdivision to enjoy the "state action" exemption, there must be an indication that its action is "authorized or directed" by the state, so that the subdivision is in fact acting on behalf of the state rather than its own parochial interests. *Id.* at 414–15, 98 S.Ct. 1123. The plurality then concluded that "an adequate state mandate for anticompetitive activities of ... subordinate governmental units exists when it is found from the authority given a governmental entity to operate in a particular area, that the legislature contemplated the kind of action complained of." *Id.* at 415, 98 S.Ct. 1123 (internal quotation omitted).

¶ 33 As an initial matter, we point out that, were we facing the same question considered by the Court in *City of Lafayette* and its successor—namely, whether to read an implicit exemption into antitrust law—we might well conclude that the Court's analysis in

those cases was inapplicable because the dual sovereignty considerations that motivated the Court's reasoning in those cases are entirely absent when a state court is considering state antitrust laws. *See Fine Airport Parking, Inc. v. City of Tulsa,* 2003 OK 27, ¶ 19, 71 P.3d 5; *Town of Hallie v. City of Chippewa Falls,* 105 Wis.2d 533, 314 N.W.2d 321, 324 (1982). The latter situation involves a potential conflict " 'between the state laws dealing with municipalities and the state antitrust law,' " *Fine Airport Parking, Inc.,* 2003 OK 27 at ¶ 19, 71 P.3d 5 (quoting *Town of Hallie,* 314 N.W.2d at 324); in other words, the laws at issue in our case are those of a single sovereign—the state.

¶ 34 Unlike the state antitrust statutes involved in these Oklahoma and Wisconsin cases, section 76–10–915 of the Utah Antitrust Act includes an explicit statutory exemption for municipalities. Utah Code Ann. § 76–10–915(1)(f). A number of other state antitrust laws also contain statutory exemptions, leading courts in those states simply to apply the plain language of these exemptions. *See, e.g., Miller's Pond Co. v. City of New London,* 273 Conn. 786, 873 A.2d 965, 979–80 (2005) (reaffirming that its statutory antitrust exemption for actions "specifically directed or required" by a state statute was intended to be more stringent than the federal "authorized or directed" standard and therefore holding that the federal standard was inapplicable); *Alarm Detection Sys., Inc. v. Village of Hinsdale,* 326 Ill.App.3d 372, 260 Ill.Dec. 599, 761 N.E.2d 782, 793 (2001) (relying on the "plain language of [the statutory exemption in] the [Illinois] Antitrust Act in determining whether the Village was immune from liability").

¶ 35 Here, Utah's statutory exemption is, as far as we are aware, unique in that it is

defined using language—"authorized or directed"—identical to that used by the *City of Lafayette* plurality. Utah Code Ann. § 76–10–915(1)(f) (exempting a municipality "to the extent authorized or directed by state law"); *City of Lafayette,* 435 U.S. at 414, 98 S.Ct. 1123 (concluding that a municipality engages in state action when "the State authorized or directed [it] to act as it did"). This identical language, together with the mandate set forth in section 76–10–926 that our interpretations be guided by federal caselaw, indicate to us that the Legislature intended the "authorized or directed" standard in section 76–10–915(1)(f) to coincide with federal courts' interpretation of "authorized or directed" when delineating the municipality exemption to federal antitrust laws.[6] The conclusion indicated by the plain language of these provisions is further supported by the fact that the Court's observations in *City of Lafayette,* in regard to the tendency of local governments to act in their own parochial interests rather than in the interest of the state as a whole, *see* 435 U.S. at 408, 98 S.Ct. 1123 would appear of equal concern to the state itself. *See Evans,* 963 P.2d at 185 (recognizing the legislative intent that "those anticompetitive activities that have been approved by the state or federal government should not be punished by the [Utah Antitrust] Act"); *see also Reppond v. City of Denham Springs,* 572 So.2d 224, 228 (La.Ct.App.1990) ("Because municipalities perform many functions in both a private and a public sense, it would be imprudent to categorically reject the applicability of the anti-trust statutes to every act of such governmental entities."). It is thus not unreasonable for the legislature to have intended us to follow federal antitrust law on this issue even though the federal analysis originates in inapplicable notions of dual sovereignty.[7]

**6.** Our conclusion here is not inconsistent with our refusal above to interpret the term "municipality" to include all units of local government in accord with the federal state action exemption. As we explained above, federal antitrust law does not ascribe a unique meaning to the word "municipality." In contrast, *City of Lafayette* used the phrase, "authorized or directed," in the course of setting forth a distinct legal standard. The latter phrase, therefore, does have a unique meaning in federal antitrust law. Moreover, the implication of our holding is that the Utah Legis-

lature simply imported the exemption recognized in *City of Lafayette* into the Utah Antitrust Act rather than trying to avoid the federal law, as the County appellees have argued.

**7.** The County appellees bolster their argument that the Utah Legislature was "actively hostile" to the Court's rulings in *City of Lafayette* and *City of Boulder* by reference to its enactment of section 76–10–919(4) and (5), which prohibits damage awards against political subdivisions that violate the Antitrust Act. Utah Code Ann. § 76–

Consequently, while we would hesitate to infer a "state action" exemption from our state antitrust law where no such exemption is expressly provided, here we conclude that the legislature has in fact expressly included such an exemption in the state antitrust laws, and we therefore analyze the exemption's applicability relying on federal caselaw for guidance.

¶ 36 Following *City of Lafayette*, the United States Supreme Court in *Town of Hallie* reaffirmed that, in order to be eligible for the state action exemption, a municipality must "show that it acted pursuant to a 'clearly articulated and affirmatively expressed ... state policy'" to displace competition. 471 U.S. at 39, 105 S.Ct. 1713 (quoting *City of Lafayette*, 435 U.S. at 410, 98 S.Ct. 1123). The standard is satisfied when the anticompetitive conduct alleged by the plaintiff "is a foreseeable result" of a state's grant of authority in a particular area. *Id.* at 42, 105 S.Ct. 1713. Thus, in *Town of Hallie*, the Court held that state statutes authorizing a city to provide sewage services outside the city limits and to determine which areas it would serve sufficiently articulated a state policy that would allow the city to refuse sewage service in a particular area unless the landowners in that area voted in favor of annexation to the city. *Id.* at 37, 42–43, 105 S.Ct. 1713. The Court in *City of Columbia* later held that state zoning laws that "authorize[d] municipalities to regulate the use of land and the construction of buildings and other structures within their boundaries," including their size, location, and spacing, were sufficient to immunize a city's ordinances limiting billboard placement. 499 U.S. at 370–73 & n. 3, 111 S.Ct. 1344. Adhering to the "foreseeable result" standard, the Court

reasoned that "[a] municipal ordinance restricting the size, location, and spacing of billboards ... necessarily protects existing billboards against some competition from newcomers," and that the anticompetitive conduct complained of by a newcomer billboard company was thus foreseeable. *Id.* at 373, 111 S.Ct. 1344.

¶ 37 The County appellees make much of the idea that *City of Columbia* substantially broadened the scope of federal antitrust immunity for municipalities, reversing the "aggressive narrowing" of such immunity that, in their view, was imposed by *City of Lafayette*. They thus argue that we should follow the same broad interpretation that, they maintain, the Court has now adopted. The Summit Water appellants disagree with the County appellees in regard to whether municipalities were altogether exempt from federal antitrust laws before the Court's ruling in *City of Lafayette*. They further contend that *City of Columbia* adhered to the same standard for construing the municipality exemption that was originated in *City of Lafayette* and followed in *Town of Hallie*.

¶ 38 Having reviewed the line of federal Supreme Court cases from *City of Lafayette* to *City of Columbia* and the opinions of lower courts construing them, we see no clear indication that the Court in *City of Columbia* intended to broaden its previously-adopted standard. The Court's primary concern in its discussion of the municipality exemption standard in that case was to clarify that a federal court applying the exemption need not determine whether a municipal act is "substantively and procedurally correct" under state law in order to conclude that the act was taken pursuant to a state policy to

10–919(4), (5). As the County appellees note, this provision mirrors the federal statute enacted by Congress in 1984, which similarly bars damage awards against local governments. Local Government Antitrust Act of 1984, 15 U.S.C. §§ 35–36. In our view, the Legislature's passage of section 76–10–919 is simply another example of its close adherence to federal antitrust law. This strengthens our conclusion that the "authorized or directed" language in section 76–10–915(1)(f) was similarly intended to parallel federal law. Moreover, while the County appellees maintain that the Supreme Court's decisions caused "considerable consternation" in Congress

and that it was this "aversion" to the Supreme Court's decisions that led to the passage of the Local Government Antitrust Act and to section 76–10–919, it seems significant that neither Congress nor the Utah Legislature simply declared all local governmental entities exempt from antitrust laws in these provisions. Their actions in limiting monetary damages while failing to grant a complete exemption appears to signal acquiescence in, and possibly even approval of, the idea that local governments may have to comply with orders of injunctive relief if their anticompetitive actions violate antitrust provisions.

displace competition. *City of Columbia*, 499 U.S. at 371–72, 111 S.Ct. 1344 (internal quotation omitted). To require federal courts to engage in such scrutiny of state law would, the Court explained, "undermin[e] the very interests of federalism [the state action immunity doctrine] is designed to protect." *Id.* at 372, 111 S.Ct. 1344.

¶ 39 This clarification thus did nothing to alter the range of state authorization that suffices to immunize anticompetitive municipal actions from antitrust laws. The outer boundaries of that range are found in two basic principles that the Court has consistently acknowledged. First, "the requirement of 'clear articulation and affirmative expression' is not satisfied when the State's position is one of mere *neutrality* respecting the municipal actions challenged as anticompetitive. A state that allows its municipalities to do as they please can hardly be said to have 'contemplated' the specific anticompetitive actions for which municipal liability is sought." *City of Boulder*, 455 U.S. at 55, 102 S.Ct. 835 (holding that a neutral grant of home rule authority to municipalities could not constitute a state "policy" to displace competition in the provision of cable television services); *see also Town of Hallie*, 471 U.S. at 43, 105 S.Ct. 1713 (concluding that specific statutory authorization to municipalities to provide sewage services outside city boundaries was not "neutral on state policy"). Second, however, the municipality need not show "a specific, detailed legislative authorization" to engage in the particular anticompetitive conduct at issue. *City of Lafayette*, 435 U.S. at 415, 98 S.Ct. 1123 (plurality); *see also City of Columbia*, 499 U.S. at 372, 111 S.Ct. 1344 ("We have rejected the contention that th[e] [clear articulation] requirement can be met only if the delegating statute explicitly permits the displacement of competition."); *Town of Hallie*, 471 U.S. at 43–44, 105 S.Ct. 1713 (rejecting the idea that "a legislature must expressly state in a statute or its legislative history that the legislature intends for the delegated action to have anticompetitive effects"); *id.* at 45, 105 S.Ct. 1713 (rejecting the idea that the municipality must "show that the State 'compelled' it to act").

¶ 40 The "foreseeability" inquiry that the Court settled on in *Town of Hallie*, 471 U.S. at 42, 105 S.Ct. 1713 and in *City of Columbia*, 499 U.S. at 373, 111 S.Ct. 1344 ensures that the required state authorization falls somewhere between these two poles. Subsequent decisions of lower federal courts have thus focused on whether the anticompetitive action alleged is a "foreseeable result" of state statutes. *See Elec. Inspectors, Inc. v. Vill. of E. Hills*, 320 F.3d 110, 121 (2d Cir. 2002) (concluding that "the plaintiff's complete exclusion from the market for required electrical inspection services .... is a foreseeable result of a statute that requires municipalities to enforce a uniform fire code and administrative regulations that condition the issuance of certificates of occupancy upon inspections by town-designated agents"); *Mich. Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 536 (6th Cir.2002) (concluding that a city's facilitation of a private telephone company's monopoly by accepting its bid to install and service pay telephones in city prisons was "the logical and foreseeable result of the City's broad authority under state law and the Michigan Constitution to bid out public contracts for the maintenance of City prisons"); *Surgical Care Ctr. v. Hosp. Serv. Dist. No. 1*, 171 F.3d 231, 235 (5th Cir.1999) (en banc) (concluding that a hospital service district's alleged exclusivity and tying agreements that aimed to exclude a private hospital from the market for outpatient surgical care were "not the foreseeable result of allowing a hospital service district to form joint ventures").

¶ 41 We therefore hold that the district court erred in concluding that "for an activity to satisfy the 'authorized or directed' requirement in section 76–10–915(1)(f) of the Utah Code it is necessary only that a political subdivision act pursuant to general state statutes." Rather, a court must examine the particular statutes at issue and then engage in the foreseeability analysis set forth above. Here, the question is thus whether the alleged price-fixing, agreements tying Mountain Regional water distribution to the grant of building permits and planning approvals, and other anticompetitive activities are the "foreseeable result" of the authority granted the County appellees under state law.

¶ 42 We first set forth the provisions that, according to the County appellees, grant the necessary authority. The County appellees cite provisions in the County Land Use, Development, and Management Act (CLUDMA) [8] and the Utah Special Service District Act, Utah Code Ann. §§ 17A–2–1301 to –1332 (2004), as providing the County appellees with authority to act and articulating a state policy to displace competition in the area of culinary water distribution. The CLUDMA provisions that, according to the County appellees, are comparable to those found sufficient in *City of Columbia* are as follows. Section 17–27a–102 provides that

> counties may enact all ordinances, resolutions, and rules and may enter into other forms of land use controls and development agreements that they consider necessary or appropriate for the use and development of land within the unincorporated area of the county, including ordinances, resolutions, rules, restrictive covenants, easements, and development agreements governing uses, density, open spaces, structures, buildings, energy-efficiency, light and air, air quality, transportation and public or alternative transportation, infrastructure, street and building orientation and width requirements, public facilities, and height and location of vegetation, trees, and landscaping, unless expressly prohibited by law.

Utah Code Ann. § 17–27a–102(1)(b) (Supp. 2005). Section 17–27a–301 requires that every county "enact an ordinance establishing a countywide planning commission." *Id.* § 17–27a–301(1)(a). Section 17–27a–401 requires that every county "prepare and adopt a comprehensive, long-range general plan" that "may provide for ... the efficient and economical use, conservation, and production of the supply of ... water." *Id.* § 17–27a–401(1), (2)(c)(i).

¶ 43 The provisions of the Special Service District Act that the County appellees assert are relevant authorize a county to "establish a special service district for the purpose of providing [water] within the area of the special service district." *Id.* § 17A–2–1304(1)(a)(i) (2004). "The area within any special service district may include all or any part of the county ... that established it except that ... a special service district may not include any area not directly benefitted by the services provided under this section without the consent of the nonbenefitted landowner." *Id.* § 17A–2–1304(2)(a)(iii). The scope of the service district's authority then includes, among other things, "[t]he power to exercise all powers of eminent domain possessed by the county ... which established" it, "[t]he power to enter into contracts ... to carry out [its] functions," and "[t]he power to acquire or construct facilities." *Id.* § 17A–2–1314(1)(b), (c), (d).

¶ 44 Although these provisions clearly contemplate a county's establishment of a water service district, such as Mountain Regional, and grant both counties and special service districts certain powers, lacking from the statutes is any suggestion that a county might use its planning or zoning authority to facilitate the operation or growth of special service districts once they are created. In particular, the general grant of authority to counties contained in section 17–27a–102 allows counties to enter into "development agreements" in a number of areas but does not mention the provision of water or other utility services. *Id.* § 17–27a–102(1)(b) (Supp.2005). Unlike in *Town of Hallie,* where a town's requirement that unincorporated areas annex themselves to the town was a prerequisite to supplying sewage services, 471 U.S. at 43, 105 S.Ct. 1713 the allegation here is that developers are precluded from proceeding with their development unless they accept Mountain Regional

---

8. The parties cite to the version of CLUDMA in effect at the time they submitted their briefs. *See* Utah Code Ann. §§ 17–27–101 to –1003 (2001 & Supp.2004) (repealed 2005). In the 2005 legislative session, the Act was renumbered and revised. *See* Utah Code Ann. §§ 17–27a–101 to –803 (Supp.2005). While generally we consider the law in effect at the time a claim arises or is brought in court, *see State v. One Lot of Pers.*

*Prop.,* 2004 UT 36, ¶¶ 13–17, 90 P.3d 639, current law is relevant when injunctive relief is requested, *see Nat'l Coalition to Save Our Mall v. Norton,* 269 F.3d 1092, 1096–97 (D.C.Cir.2001) (citing *Miller v. French,* 530 U.S. 327, 120 S.Ct. 2246, 147 L.Ed.2d 326 (2000)). Because injunctive relief is requested here, we consider the current version of the CLUDMA in our analysis.

water services; in *Town of Hallie,* desired services were tied to acceptance of incorporation within the governmental entity that provided those services while in our case, developers are allegedly forced to accept services they may or may not desire. The Special Service District Act itself appears to prohibit a service district from incorporating a nonbenefitted landowner's property without the landowner's consent. Utah Code Ann. § 17A–2–1304(2)(a)(iii) (2004).

¶ 45 We can find no other statute within either of these Acts that contemplates any connection between a county's development activities and its favoring of special service districts that it has established. The statutory scheme does not reveal a state policy of allowing counties to displace competition with a special service district unless the special service district is successful through its own competitive efforts in acquiring an exclusive market share within its area. Other courts have similarly noted that a state's grant of authority to a government entity or utility to provide a natural resource does not necessarily indicate an intent to immunize the entity or utility from antitrust laws. *See Cantor v. Detroit Edison Co.,* 428 U.S. 579, 595–96, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976) ("There is no logical inconsistency between requiring [a private utility] to meet regulatory criteria insofar as it is exercising its natural monopoly powers and also to comply with antitrust standards to the extent that it engages in business activity in competitive areas of the economy."); *Parks v. Watson,* 716 F.2d 646, 663 (9th Cir.1983) ("[M]erely because the state may authorize a city to be the sole supplier of a natural resource and to set

prices for that resource, it does not necessarily follow that the city is immunized from antitrust liability when it attempts to tie the purchase of a non-monopolized product or service to the sale of that natural resource."). We therefore conclude that the anticompetitive activities alleged by the Summit Water appellants, including the act of tying building permit and planning approvals for developers and others to acceptance of Mountain Regional as the development's water provider, are not a foreseeable result of the statutory scheme.[9]

¶ 46 Accordingly, even assuming without deciding that the County appellees qualify as "municipalities" under Utah Code section 76–10–915(1)(f), they would not be entitled to the municipality exemption contained in that subsection because their alleged anticompetitive conduct is not "authorized or directed by state law." We therefore reverse the district court's dismissal of the Summit Water appellants' complaint on that basis.[10]

## II. WHETHER THE EXEMPTIONS IN SECTION 76–10–915 ARE AFFIRMATIVE DEFENSES

¶ 47 We further reverse the district court in regard to its requirement that the Summit Water appellants amend their pleadings to assert specifically that the anticompetitive activities alleged were not authorized or directed by state law. The structure of the Utah Antitrust Act, together with federal antitrust caselaw, make clear that the exemptions in Utah Code section 76–10–915(1)(f) are to be pleaded by a defendant as an affirmative defense. *See* Utah R. Civ. P. 8(c)

---

**9.** We note, however, that anticompetitive effects resulting from activities that any of the County appellees undertake in the ordinary course of performing their authorized duties, where there are no uncontemplated ties between county and special service district functions, might be considered foreseeable. Moreover, we recognize that the Court in *City of Columbia* rejected a "conspiracy" exception to the municipality exemption. 499 U.S. at 379, 111 S.Ct. 1344 (refusing to "allow plaintiffs to look behind the actions of state sovereigns to base their claims on 'perceived conspiracies to restrain trade'" and reaffirming that, "with the possible market participant exception, *any* action that qualifies as state action" under the foreseeability test is "exempt from the operation of the antitrust laws").

**10.** Because we conclude that the actions alleged by the Summit Water appellants are not "authorized or directed by state law" under section 76–10915(1)(f), we need not address the Summit Water appellants' additional argument that the municipality exemption does not apply to the County appellees because they are acting as market participants. As noted above, *City of Columbia* left open the question of whether the municipality exemption would apply when the municipality is acting as a market participant. 499 U.S. at 379, 111 S.Ct. 1344. Further, the Summit Water appellants' claim that Senator Waddingham's affidavit was inappropriately excluded is moot under our conclusion here.

("In pleading to a preceding pleading, a party shall set forth affirmatively ... any ... matter constituting an avoidance or affirmative defense."). Section 76–10–915 states that other provisions of the Antitrust Act must not "be construed to prohibit" the activities that it lists, including "the activities of a municipality to the extent authorized or directed by state law." Utah Code Ann. § 76–10–915(1)(f). The County appellees argue that this language distinguishes the antitrust exemptions from a proper affirmative defense because in the case of the exemptions, "[t]he cause of action never arises in the first instance." We do not agree that there is a meaningful distinction in that regard between the exemptions listed in section 76–10–915 and other affirmative defenses. There is no legitimate cause of action against an individual who kills another in self-defense, for example, but a murder defendant is nevertheless required to assert self-defense as an affirmative defense. *See* Utah Code Ann. § 76–2–402 (2003); *State v. Starks*, 627 P.2d 88, 92 (Utah 1981).

¶ 48 The line of federal Supreme Court cases since *City of Lafayette* indicates that the municipality exemption is regarded as an affirmative defense. *See, e.g., City of Columbia*, 499 U.S. at 369, 111 S.Ct. 1344 (indicating that the municipality exemption was asserted by the defendants in a motion for judgment notwithstanding the verdict); *id.* at 372, 111 S.Ct. 1344 (referring to the doctrine at issue as "the *Parker* [*v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943)] defense"). Moreover, as the County appellees concede, the burden is on the municipality to "demonstrate that it is engaging in the challenged activity pursuant to a clearly expressed state policy" to displace competition. *Town of Hallie*, 471 U.S. at 40, 105 S.Ct. 1713. It would make little logical sense to require plaintiffs to specifically plead a matter in the negative that the defendants would then be required to prove to the contrary in order to prevail against the plaintiffs on that ground.

### III. CAUSE OF ACTION UNDER UTAH CONSTITUTION ARTICLE XII, SECTION 20

¶ 49 As indicated above, the parties disagree as to whether we need determine whether Article XII, Section 20 is self-executing when we have already determined that the Summit Water appellants may proceed with their statutory claim under the Utah Antitrust Act. While the Summit Water appellants suggest that we need not reach the constitutional issue, the County appellees allege that we must resolve the issue of whether the constitutional provision "trumps all the liability and damage limitations in the 1979 Act." We accept the concession of the Summit Water appellants for the following reasons. First, the County appellees have not provided any specific citation to the record where we might find the assertion that they ascribe to the Summit Water appellants. The amended complaint submitted by the Summit Water appellants does list Article XII, Section 20 as a parallel basis, together with the Utah Antitrust Act, for awarding injunctive relief against the County appellees and damages against Montgomery Watson and Jarvis. The complaint does not suggest, however, that the constitutional provision "trumps" the statute in this regard.

¶ 50 Second, the Summit Water appellants lost on the issue of the proper interpretation of Article XII, Section 20 below. Their concession on that point, if we decide in their favor on the statutory issue, suggests that they do not consider a constitutional right of action essential to their complaint as long as their statutory claim is intact. Our settled policy is to avoid giving advisory opinions in regard to issues unnecessary to the resolution of the claims before us. *Savage v. Utah Youth Vill.*, 2004 UT 102, ¶ 25, 104 P.3d 1242. We therefore decline to analyze whether Article XII, Section 20 is self-executing.

### CONCLUSION

¶ 51 We reverse the district court's dismissal of the Summit Water appellants' claims under section 76–10–914 of the Utah Antitrust Act. We hold that, even assuming the defendants qualify as "municipalities" for purposes of section 76–10–915(1)(f), the activities at issue here were not "authorized or

directed by state law," and defendants are therefore not exempt from the requirements of the Utah Antitrust Act. We further reverse the district court's order requiring the Summit Water appellants to specifically plead that the activities they allege are not authorized or directed by state law because we hold that the exemptions in section 76–10–915 constitute affirmative defenses, which must be pleaded by a defendant. Finally, because we decide in favor of the Summit Water appellants on their statutory claim, we do not consider whether Article XII, Section 20 of the Utah Constitution is self-executing.

¶ 52 Associate Chief Justice WILKINS, Justice DURRANT, Justice PARRISH, and Judge WILLMORE concur in Chief JUSTICE DURHAM's opinion.

¶ 53 Having recused himself, Justice NEHRING does not participate herein; District Judge Thomas WILLMORE sat.